UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| STEVE FLETCHER,<br><br>    Plaintiff,<br><br> vs.<br><br>U.S. RENAL CARE, INC.,<br><br>    Defendant. | 1:15-CV-491<br><br>JUDGE SUSAN J. DLOTT<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

   This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 22). Plaintiff Steven Fletcher brings this reverse-race discrimination and retaliation case against his former employer, Defendant U.S. Renal Care, Inc. U.S. Renal Care contends that it is entitled to judgment as a matter of law because, among other deficiencies, Fletcher was not subjected to an adverse employment action. For the reasons that follow, the Court will **GRANT** the Motion for Summary Judgment.

**I.  BACKGROUND**

**A.  Facts Underlying Fletcher's Claims**

   **1.  Fletcher's Early Employment History with U.S. Renal Care**

   U.S. Renal Care operates outpatient dialysis clinics for patients with renal disease. (Nelson Dec., Doc. 22-2 at PageID 209.) It employs nurses and technicians to care for patients. (*Id.*) Dialysis nurses provide initial assessments of patients, take and document doctor orders, distribute medicine, address problems during patient treatment, assure water checks, and tend to emergent situations. (*Id.*; Fletcher Dep., Doc. 21 at PageID 61.) Dialysis clinics are regulated,

1

and they are required to maintain certain nurse staffing levels at all times.  (Nelson Dec., Doc. 22-2 at PageID 210.)

Steven Fletcher is a Caucasian registered nurse ("RN") who obtained his associates degree in nursing in 2012.  (Fletcher Dep., Doc. 21 at PageID 51, 88.)  Fletcher was hired by U.S. Renal Care in approximately March 2013 as a float nurse for its dialysis clinics in the Mount Healthy, Kenwood, Norwood, and Eastgate areas near Cincinnati, Ohio.  (*Id.* at PageID 61; Fletcher Dec., Doc. 26-1 at PageID 315.)  Fletcher reported in September 2013 that his manager, Daphne Jones, was deducting time for a lunch break from his pay even though he was working through lunch.  (Fletcher Dep., Doc. 21 at PageID 65; Foley Dec., Doc. 22-1 at PageID 206.)  Andrea Foley, a regional human resources ("H.R.") manager for U.S. Renal Care, investigated the issue.  Foley, a Caucasian, determined that U.S. Renal Care owed Fletcher unpaid wages in the amount of $4,500 for the lunch time work and for a float nurse differential pay award.  (Foley Dep., Doc. 26-2 at PageID 321; Fletcher Dec., Doc. 26-1 at PageID 315.)

Fletcher transferred out of the float position to an RN position at Defendant's Norwood clinic in late September or early October 2013.  (Fletcher Dep., Doc. 21 at PageID 72; Doc. 21-1 at PageID 141.)  In December 2013, he transferred at his request to an RN position at the Kenwood clinic working the second shift for 40 hours per week.  (Fletcher Dep., Doc. 21 at PageID 73; Foley Dec., Doc. 22-1 at PageID 206.)

The next month, in January 2014, the Kenwood clinic was cited during a state audit for "several conditions related to patient care and compliance with state regulations."  (Foley Dec., Doc. 22-1 at PageID 206.)  U.S. Renal Care hired Devon Nelson in February 2014 to become the new facility administrator for the Kenwood facility.  (Nelson Dec., Doc. 22-2 at PageID 209.) She took over the position and became Fletcher's supervisor in May 2014 following a period of

training at the Kenwood facility. (*Id.*) It was her first supervisory position. (*Id.*) She was instructed to ensure that the Kenwood clinic complied with state regulations and U.S. Renal Care policies. (Foley Dec., Doc. 22-1 at PageID 206.) Nelson, as the facility administrator, reported to Sabon Shelton, a regional manager. (Nelson Dep., Doc. 26-3 at PageID 328.) Nelson and Shelton are both African-American. (Fletcher Dec., Doc. 26-1 at PageID 315.)

Prior to Nelson taking over as the facility administrator, Mattie Hibbs, the acting facility administrator at the Kenwood clinic, completed Nelson's first annual performance review dated April 17, 2014. (Doc. 21-2 at PageID 155–57.) Hibbs rated Fletcher as "Meets Expectations" in all performance categories. (*Id.*) However, she noted that he needed to improve in the areas of responding to problems in a timely manner, calling physicians about issues in a timely manner and more frequently, making better judgments, and better documenting water checks. (*Id.*) Fletcher documented his disagreement with some of the comments made in the performance review. (*Id.*) He also talked to Shelton, the regional manager, about the review. (Fletcher Dep., Doc. 21 at PageID 94.) Fletcher testified that Shelton responded that "we'd go over it, he'd fix it, take care of it, and he never did." (*Id.*)

### 2. More Problems Develop in the Employment Relationship

In May 2014, Nelson, then Fletcher's supervisor, determined that Fletcher needed more training. (Nelson Dec., Doc. 22-2 at PageID 211.) She asked Fletcher to take a charge nurse class. (Fletcher Dep., Doc. 21 at PageID 81.) Fletcher responded that he had already taken the class. (*Id.*) He testified that Nelson told him that the class was not mandatory. Fletcher did not take the class. (*Id.*) On May 20, 2014, Nelson spoke to human resources about disciplining Fletcher for refusing to take the training, but Foley, the H.R. manager, convinced her to wait. (Nelson Dec., Doc. 22-2 at PageID 209–10; Foley Dec., Doc. 22-1 at PageID 207.) Foley

3

counseled Nelson to try to obtain Fletcher's compliance before disciplining him. (Foley Dec., Doc. 22-1 at PageID 207.)

On May 30, 2014, Nelson told Fletcher that he could no longer wear black jeans to work. (Fletcher Dep., Doc. 21 at PageID 96, 98.) Her instruction was consistent with U.S. Renal Care's written policy which called for employees to wear "[a]ppropriate work attire" and stated that "[j]eans are not acceptable attire in patient care areas." (Doc. 22-2 at PageID 214.) Fletcher testified that their interaction was cordial and that he did not respond to Nelson. (Fletcher Dep., Doc. 21 at PageID 99.) Nelson, conversely, stated that Fletcher "became belligerent" and used "inappropriate and abusive" language. (Nelson Dec., Doc. 22-2 at PageID 211.)

Fletcher called Shelton about the issue. (Fletcher Dep., Doc. 21 at PageID 99.) He testified that Shelton told him that he could continue to wear jeans and that the matter would be addressed at a nurses' meeting set for June 17, 2014. (*Id.* at PageID 96, 99.) The next week, Fletcher also called Foley to complain about being "singled out" by Nelson for wearing jeans. (*Id.*) Fletcher continued to wear jeans at work. (*Id.* at PageID 96.) He does not remember other nurses wearing jeans to work, but he does remember other nurses wearing sweatpants or t-shirts to work. (*Id.* at PageID 97.) He was told by two white nurses that they were instructed to not wear t-shirts, and they complied. Jacob, a black nurse who wore sweatpants, told Fletcher that he was never instructed not to wear sweatpants. (*Id.*)[1]

On June 3, 2014, Fletcher complained about Nelson in an email to Foley. He alleged that Nelson "has chosen to single out and harass only the Caucasian personal [*sic*]." (Doc. 21-2 at PageID 183.) He also alleged that Nelson threatened to write him up about wearing jeans. (*Id.*)

---

[1] Fletcher's testimony about what the other nurses told him they were told about wearing sweatpants and t-shirts is inadmissible hearsay. Fed. R. Evid. 801.

4

Foley responded in an email dated June 5, 2014 that Fletcher should confirm with Shelton "if it has been determined that the entire clinic is to only wear scrubs or if jeans and other apparel is allowed." (*Id.* at PageID 184–85.) She stated that he should not be singled out and that "[i]f it is determined that your clinic is to wear scrubs only, that will go for everyone." (*Id.*) She also stated that "I am unaware that Devon [Nelson] was targeting Caucasians and this is the first time I have heard this." (*Id.*) She stated that Fletcher should provide her with details about discriminatory actions so she could address them. (*Id.*)

Fletcher replied that day to Foley with additional complaints that Nelson demonstrated racism, threatened to write up him and other Caucasian employees, and caused one employee to leave employment with U.S. Renal Care. (*Id.* at PageID 184.)

In an email dated June 6, 2014, Nelson provided Shelton with copies of patient charting notes dated June 4, 2014 which she described as including doctor's orders written down by Fletcher on the wrong patient's chart. (Nelson Dep., Doc. 37 at PageID 524; Doc. 37-1 at PageID 9.) Nelson testified that she discussed the June 4, 2014 charting problem with Fletcher around the time of the incident. (Nelson Dep., Doc. 37 at PageID 525.) Fletcher testified that Nelson was mistaken and that he did not make a charting error. (Fletcher Dep., Doc. 21 at PageID 77.)

Another conflict between Fletcher and Nelson arose on June 9, 2014, when Fletcher left work for an emergency dental appointment. (Fletcher Dep., Doc. 21 at PageID 90–91.) Fletcher did not request permission to leave work prior to the start of his shift despite knowing he had requested an emergency appointment with a dentist. (*Id.*) He knew Nelson was in the building, and he assumed she could help the clinic meet the required nursing staff level while he was gone. (*Id.*) Fletcher told Nelson about the appointment as he was leaving work. He testified that she

responded, "I am not authorizing it, but do what you need to do." (*Id.*) He was not asked to provide a medical excuse from the dentist, nor did he provide such documentation. (*Id.*)

Fletcher sent Foley another email on June 10, 2014 complaining about Nelson. (Doc. 21-2 at PageID 187.) He stated that "the work environment at our facility under the guidance of Devon [Nelson] has become more hostile." (*Id.*)

In the second week of June 2014, Nelson informed Scott Sasserson, the U.S. Renal Care chief operating officer, who was in Cincinnati for other reasons, about patient charting errors by Fletcher. (Nelson Dec., Doc. 22-2 at PageID 212.) The errors included failing to document the name of the doctor issuing a medical order and putting th patient note on the wrong patient's chart. (*Id.* at PageID 211–12, 215–16.) Sasserson, who is Caucasian, forwarded his email communications with Nelson about the patient charting errors to Foley on June 10, 2014. (*Id.* at PageID 212; Foley Dep., Doc. 26-2 at PageID 322.) Nelson had not discussed her concerns about Fletcher's charting notes with Foley prior to June 10, 2014. (Foley Dep., Doc. 26-2 at PageID 322.)

### C. Decision to Discipline Fletcher and Fletcher's Resignation

Foley investigated Fletcher for performance issues. (Foley Dec., Doc. 22-1 at PageID 208.) She asked Joanne Zimmerman, the vice president of clinical services, to review Fletcher's charting notes about doctor orders as part of the investigation. Zimmerman, who is Caucasian, determined that Fletcher's written orders were "lacking," which raised patient safety concerns. (*Id.*) Foley, along with Shelton, the regional director, and Sasserson, the chief operating officer, made the decision to discipline Fletcher. (*Id.* at PageID 207; Nelson Dec., Doc. 22-2 at PageID 212.) Nelson "did not make the decision about what to include on the discipline." (Foley Dec., Doc. 22-1 at PageID 207; Nelson Dec., Doc. 22-2 at PageID 212.)

6

On June 11, 2014, Nelson presented Fletcher with a written counseling form in the presence of Shelton and Sasserson.  (Doc. 21-2 at PageID 172; Nelson Dec., Doc. 22-2 at PageID 212.)  The form identified multiple incidents concerning "Patient Safety/Policy and Procedure/Insubordination" which are summarized as follows:

- March 17, 2014:  Fletcher failed to document in patient progress notes an issue with fluid overload, an omission which could have jeopardized the patient's health;

- May 5, 2014: Fletcher made an incomplete patient order transcription.

- June 6, 2014:  Fletcher made a similar incomplete patient order transcription and wrote it for the wrong patient.

- May 2014:  Fletcher failed to attend a repeat nurse charge class offered on May 21, 2014.

- May 2014:  Fletcher failed to complete the nurse charge checklist.

- June 9, 2014:  Fletcher left work for an emergency dentist appointment without approval causing the clinic to fail to meet the required nurse to patient staffing ratio.

- May 30, 2014:  Fletcher disregarded the facility manager's request that he not wear jeans to work and directed inappropriate language and profanity toward her.

(Doc. 21-2 at PageID 172–73.)  Nelson was unaware that Fletcher had made racism complaints against her when she issued the counseling form to him.  (Nelson Dec., Doc. 22-2 at PageID 213.)

The counseling form was considered a final warning because all disciplines regarding patient safety issues are considered final warnings.  (Foley Dec., Doc. 22-1 at PageID 208.)  Fletcher signed the counseling form acknowledging that he had received it, but he stated that he "strongly disagree[d]" with the discipline.  (Doc. 21-2 at PageID 172–73.)  Sasserson did not permit Fletcher to defend himself or explain the incidents at the disciplinary meeting.  (Fletcher Dep., Doc. 21 at PageID 102–04.)

7

Fletcher resigned from U.S. Renal Care on June 13, 2014.  He stated in his resignation letter that "[t]he work place has become hostile and intolerable due to racism, retaliation, and other questionable behavior by management."  (Doc. 21-2 at PageID 175.)  U.S. Renal Care transferred Samatha Waggoner, a Caucasian, to the Kenwood clinic to replace Fletcher.  (Nelson Dec., Doc. 22-2 at PageID 212; Nelson Dep., Doc. 26-3 at PageID 334.)

**B.     Procedural History**

Fletcher initiated this action against U.S. Renal Care on July 27, 2015.  (Doc. 1.)  Fletcher asserts claims for racial discrimination and retaliation in violation of Chapter 4112 of the Ohio Revised Code, Title VII, 42 U.S.C. §§ 2000e-2 and 2000e-3, and 42 U.S.C. § 1981.  U.S. Renal Care has moved for summary judgment.  The matter is fully briefed and ripe for adjudication.  The case originally was assigned to the Honorable Judge Sandra S. Beckwith, but it was transferred to the Undersigned Judge on September 28, 2016.  (Doc. 27.)

**II.    STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811.

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the

8

burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III. ANALYSIS

#### A. Discrimination/Constructive Discharge

Fletcher asserts a claim of reverse-racial discrimination in the form of a constructive discharge in violation of federal and Ohio law. Section 1981 guarantees to all persons "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Similarly, the Ohio Revised Code makes it unlawful for an employer "because of the race . . . of any person, to discharge without cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment." Ohio Rev. Code § 4112.02(A). Disparate treatment discrimination claims brought under Ohio law are governed by the same standards as the federal claims. *See Woods v. FacilitySource, LLC*, 640 F.

9

App'x 478, 483 (6th Cir. 2016); *Plumbers & Steamfitters Jt. Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (1981).

Fletcher alleges that he was constructively discharged from U.S. Renal Care because he is Caucasian. He presents no direct evidence of racial discrimination. No one at U.S. Renal Care made any comments that he found racially offensive or discriminatory. (Fletcher Dep., Doc. 21 at PageID 88–89.) Also, Fletcher concedes that he was not directly fired, demoted, denied a promotion, or denied a pay raise or bonus on the basis of his race. (*Id.* at PageID 63.) Therefore, Fletcher must establish a genuine dispute whether he was discriminated against using circumstantial evidence under the *McDonnell-Douglas* framework.

First, a plaintiff using circumstantial evidence must establish a prima facie case of race discrimination. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). To establish a prima facie case of reverse-race discrimination under Ohio or federal law, a plaintiff must prove the following elements:

1. Background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority;
2. He was qualified for his job;
3. He suffered an adverse employment decision; and
4. He was treated differently than similarly situated employees of a different race.

*Nelson v. Ball Corp.*, 656 F. App'x 131, 134–35 (6th Cir. 2016) (internal quotations and citations omitted). If the plaintiff makes a prima facie case, the defendant then has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Clay*, 501 F.3d at 703. Finally, after the defendant articulates a non-discriminatory reason, the plaintiff must establish that the proffered reason is pretext for discrimination. *Id.*

U.S. Renal Care argues that summary judgment is appropriate because Fletcher cannot establish the first, third, or fourth elements of his prima facie case. Background circumstances

10

sufficient to satisfy the first element include significant statistical evidence, evidence that a member of a racial minority made the adverse employment decision and treated minority employees better, and evidence of an organizational preference for a diverse group of employees. *Nelson*, 656 F. App'x at 136 (citation omitted). The first element is not satisfied in the absence of other unusual circumstances when the plaintiff is Caucasian and the employees involved in the investigation and termination of the plaintiff also are Caucasian. *Id.* at 137.

Here, both African-American and Caucasian management employees participated in the investigation and discipline of Fletcher. Nelson, the African-American facility administrator, reported patient charting errors by Fletcher to Sasserson, the Caucasian chief operating officer. He forwarded the information on to Foley, the Caucasian H.R. manager, and she in turn had the charting errors confirmed by Zimmerman, the Caucasian vice president of clinical services. Sasserson and Shelton, the African-American regional manager, prepared the counseling form final written warning against Fletcher. Their disciplinary decision was reviewed and approved by Foley. Nelson did not help make the decision as to what issues to include in the counseling form. This first element presents a close question. However, the Court need not reach a definitive conclusion on the first element because Fletcher has not put forward sufficient evidence to prove the third or fourth elements.

Regarding the third element, Fletcher asserts that he suffered an adverse employment action in the form of a constructive discharge. "A constructive discharge requires a determination that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Smith v. Henderson*, 376 F.3d 529, 533–34 (6th Cir. 2004) (internal quotations and citations omitted). To demonstrate a constructive discharge, Fletcher must adduce evidence to show that (a) U.S. Renal

11

Care deliberately created intolerable working conditions, as perceived by a reasonable person and, (b) the company did so with the intention of forcing him to quit. *Henry v. Abbott Labs.*, 651 F. App'x 494, 507 (6th Cir. 2016); *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Id.* "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Moore*, 171 F.3d at 1080 (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). An employee's subjective beliefs are not sufficient to meet the burden of establishing a constructive discharge. *Henry*, 651 F. App'x at 508. Relevant factors leading to objectively intolerable conditions can include demotions, reductions in salary or job duties, conduct intended to harass or humiliate, and offers of early retirement or continued employment on less favorable terms. *Arnold v. Cincinnati Sportservice, Inc.*, No. 1:12-cv-460, 2013 WL 3761071, at *14 (S.D. Ohio 2013) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001)).

Fletcher alleges in the Complaint that the following circumstances are evidence that he was constructively discharged:

> the discriminatory conduct sanctioned by Defendants, the retaliatory first and Final Warning, Defendant's refusal to discuss Plaintiff's response to the accusations in the warning, and the concern that Defendant would make a false report to the State Board of Nursing if he was terminated.

(Doc. 1 at PageID 3.) He later added that he found the presence of Shelton and Sasserson at the disciplinary hearing to be "very threatening and intimidating" and a sign that they would "accept [Nelson's] view of anything that happened in the future." (Doc. 26-1 at PageID 316.) He also was concerned about having a termination on his employment record when he was 59 years old and new to the nursing field in June 2014. (*Id.*)

None of these circumstances suffice as a matter of law to turn a disciplinary warning into an actionable constructive discharge. To begin, it is well-settled that a disciplinary written warning alone is not sufficient to establish constructive discharge. *See*, *e.g.*, *Henry*, 651 F. App'x at 507–08 (issuance of low performance evaluation and letter of expectations not sufficient to constitute intolerable conditions); *Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004) (stating "the manner in which" job performance is criticized and job duties are assigned ordinarily is not enough for constructive discharge); *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) ("[C]riticism in performance reviews and institution of performance improvement plans, alone, do not constitute objectively intolerable conditions."); *Swann v. Time Warner Entertainment Co., L.P.*, 126 F. Supp. 3d 973, 983 (S.D. Ohio 2015) ("[W]ritten discipline and negative performance reviews do not amount to adverse employment actions where unaccompanied by a materially adverse change in the terms and conditions of a plaintiff's employment.")

Next, Fletcher's concern that U.S. Renal Care would file a false report against him with the State Board of Nursing is speculative and objectively unreasonable. Fletcher had heard that Daphne Jones, his former manager when he was a float nurse, had tried to get employees' nursing licenses revoked. (Fletcher Dep., Doc. 21 at PageID 73.) However, he admits that the allegations against Jones were "rumor" and "suspicion." (*Id.*) Also, Jones was not employed at the Kenwood clinic, was not Fletcher's supervisor, and was not involved in the disciplinary action taken against Fletcher in June 2014. Fletcher's unfounded concern about a Board of Nursing complaint cannot support a determination that he was constructively discharged.

Likewise, Fletcher's subjective fear that he would be fired is not sufficient in the absence of objective evidence that the company intended to terminate him. *See Spence v. Potter*, No.

1:07-cv-526, 2010 WL 518179, at *12 (S.D. Ohio Feb. 3, 2010), *aff'd*, 515 F. App'x 561 (6th Cir. 2013); *see also Agnew*, 286 F.3d at 310 ("An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged."). U.S. Renal Care treats all patient safety violations as final warnings, but there is no evidence that U.S. Renal Care intended to terminate Fletcher. Fletcher admitted that no one told him he was fired. He understood generally that if he "followed policies and did what [he] was supposed to be doing," he would not be fired. (Fletcher Dep., Doc. 21 at PageID 104.) He agreed that neither Foley nor Shelton, two of the three final decisionmakers, did anything specific to make him quit. (*Id.*) Finally, his belief that Sasserson would not let him defend himself at the June 11, 2014 disciplinary meeting because Sasserson wanted him to quit is mere speculation. (*Id.*)

Finally, Fletcher's allegations of discriminatory conduct by Nelson do not rise to the level of creating objectively intolerable conditions. Nelson only had been his supervisor for one month. Fletcher asserted that Nelson attempted to enforce the company dress code against him, pointed out alleged patient charting errors, and reacted with hostility when he left work for an emergency dental appointment without giving sufficient notice. Fletcher also stated that Nelson did not seem surprised or ask him to reconsider when he resigned his position. These complaints amount to minor slights or trivial harms that do not separately or together constitute objectively intolerable conditions. Thus, the Court concludes that no reasonable juror could conclude that Fletcher was constructively discharged. Fletcher has not presented sufficient evidence to establish the third element of his prima facie case.

Similarly, as to the fourth element of the prima facie case, Fletcher has not created a material dispute as to whether he was treated differently than similarly-situated employees because of his race or that he was replaced by an employee of a different race. *Nelson*, 656 F.

14

App'x at 134–35 (setting forth the elements of a prima facie case). The evidence is undisputed that U.S. Renal Care transferred Samantha Waggoner, a Caucasian, to the Kenwood clinic to replace Fletcher. Fletcher suggests that a jury could conclude that Waggoner was not his replacement because she left employment with U.S. Renal Care sometime thereafter due to a pregnancy, (Nelson Dec., Doc. 26-3 at PageID 334), but the argument is unavailing. Fletcher offers no evidence that U.S. Renal Care knew Waggoner would leave employment permanently or that the company considered her to be a temporary replacement.

Nor does Fletcher offer evidence that U.S. Renal Care treated similarly-situated employees differently in material respect because his purported comparators were not similarly situated to him. He was not similarly situated to an African-American employee who allegedly was permitted to take long lunches, because he chose to work through his lunch for payment. (Fletcher Dep., Doc. 21 at PageID 90.) He was not similarly situated to nurses who allegedly wore sweat pants to work without facing discipline, because the dress code specifically prohibited only jeans and not sweats. He was not similarly situated to managers such as Nelson and Jones who allegedly made charting errors or violated company policy because he was not a manager. The Court concludes that Fletcher lacks sufficient evidence to establish the fourth element of his prima facie case.

The Court will grant summary judgment to U.S. Renal Care on the discrimination claims.

**B.     Retaliation Claim**

Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees" because the employee "opposed . . . an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). The Ohio Revised Code makes it unlawful "[f]or any person to discriminate in any manner against any other person because that person has

opposed any unlawful discriminatory practice defined in this section." Ohio Rev. Code § 4112.02(I). To establish a prima facie case of retaliation, a plaintiff must prove the following:

> (1) he engaged in activity protected under Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citation omitted). Title VII retaliation claims must be proven under the traditional but-for causation standard. *Univ. of Tex. S.W. Med. Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Fletcher can easily satify the first and second elements of the prima facie case. Protected activity includes "not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster*, 746 F.3d at 730. It is irrelevant whether the challenged practice about which the plaintiff complained ultimately is found to unlawful under Title VII. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir. 2000). Fletcher met these elements when he complained to Foley and Shelton about Nelson's alleged discrimination against him and in favor of African-American employees.

Fletcher also can satisfy the third element. "The 'materially adverse action' element of a Title VII retaliation claim is substantially different from the 'adverse employment action' element of a Title VII race discrimination claim." *Laster*, 746 F.3d at 719. The burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the discrimination context. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 67 (2006); *Arnold v. Cincinnati Sportservice, Inc.*, No. 1:12-cv-460, 2013 WL 3761071, at *11 (S.D. Ohio 2013). In a retaliation claim, the plaintiff need only show that "a reasonable employee would have found the challenged action materially adverse, which in this context

means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (internal quotation and citation omitted). The materiality requirement is intended to separate significant harms from trivial harms. *Id.* The retaliation statutes do not protect an employee "from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

The materially adverse action here is the issuance of the counseling form documenting Fletcher's alleged performance deficiencies. An employer's adverse actions can satisfy the materiality standard for purposes of Title VII retaliation even though the actions did not create objectively intolerable conditions necessary for a constructive discharge. *Laster*, 746 F.3d at 719. A reasonable employee might have been dissuaded from continuing to complain about a supervisor's discriminatory conduct after he is issued a disciplinary final written warning by the supervisor in the presence of and with the approval of higher-level managers. Fletcher has created at least a genuine issue of fact whether he was subjected to a materially adverse employment action.

However, the Court finds that Fletcher has not presented sufficient evidence of causation to satisfy the fourth element. The causation element in a Title VII retaliation claim "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533; *see also Green v. Central Ohio Transit Auth.*, 647 F. App'x 555, 560 (6th Cir. 2016) (same). "Causation can be established by . . . evidence that the plaintiff was subjected to closer disciplinary scrutiny after engaging in protected activity." *Green*, 647 F. App'x at 560. Temporal proximity can be evidence of causation, but it is not sufficient to establish causation by itself. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013) ("Temporal proximity alone cannot establish a

causal connection."), *abrogated on other grounds by*, *Nassar*, 133 S. Ct. at 2533 (regarding but for causation); *see also Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (same principle); *but see Green*, 647 F. App'x at 560 (calling Sixth Circuit case law "inconsistent" as to whether proximity alone can be sufficient to prove causation).

Fletcher contends that the temporal proximity between (1) his complaints about Nelson to Foley, the H.R. manager, and Shelton, the regional manager, in late May or early June 2014 and (2) the issuance of the counseling form on June 11, 2014 is evidence of causation. U.S. Renal Care responds that any inference of causation created by temporal proximity is rebutted under the facts of this case. First, Nelson discussed disciplining Fletcher for performance issues with U.S. Renal Care's H.R. department on May 20, 2014, prior to the first time that Fletcher complained about Nelson to Shelton or Foley. Foley urged Nelson at that time to try to obtain Fletcher's compliance with procedures before issuing discipline. Later, on June 6 and 10, 2014, Nelson, who still was unaware that Fletcher had accused her of racism, informed Shelton, and then Sasserson and Foley, about Fletcher's patient charting errors. Zimmerman, confirmed the patient charting errors.[2] Patient charting errors raised patient safety concerns that mandated the issuance of the counseling form, a final written warning under U.S. Renal Care's policy. This "intervening legitimate reason" for the issuance of the disciplinary counseling form negates any inference of retaliation created by temporal proximity. *See Green*, 647 F. App'x at 561

---

[2] Fletcher denies that he made a charting note in the wrong patient's file. (Doc. 21 at PageID 77.) He testified that another nurse confirmed he had not made a charting error. (*Id.*) However, his testimony as to what the other nurse told him is inadmissible hearsay. Even if the Court assumes Fletcher had admissible evidence that he did not make a charting error in June 2014, this dispute would not create a genuine issue of material fact precluding summary judgment. First, the June 4, 2014 charting error is not the only alleged charting error. Fletcher does not deny that his May 5, 2014 charting notes were incomplete. Second, Nelson reported the charting errors to Shelton on June 6, 2014 and to Sasserson on June 10, 2014. No reasonable jury could find that Nelson acted with a retaliatory purpose in reporting the charting errors because there is no evidence that she was aware of the discrimination complaints against her. Sasserson forwarded information about the charting errors to Foley who had the charting errors confirmed by Zimmerman. Fletcher does not present evidence challenging the supervisory employees' belief that Fletcher made the charting errors.

18

("Nevertheless, an "intervening legitimate reason" to take an adverse employment action will "dispel[ ] an inference of retaliation based on the temporal proximity.") (citation omitted).

Additionally, Fletcher points out that Foley described him as a "frequent flyer" who would "complain a lot."  (Foley Dep., Doc. 38 at PageID 609.)  He argues that this quote is evidence that U.S. Renal Care wanted to retaliate against him for making complaints.  However, the quote is not evidence of causation when read in context.  Foley testified that because Fletcher was a frequent complainer, her goal was to make sure that Fletcher "felt understood and that we addressed his concerns."  (*Id.*)  She stated that she was trying to "coach[ ]" Nelson on how to address Fletcher's concerns.  (*Id.*)  The full testimony does not support his argument that she or U.S. Renal Care intended to retaliate against Fletcher for his complaints.  The Court concludes that Fletcher has not presented sufficient evidence to create a genuine issue of material fact that U.S. Renal issued the disciplinary final warning to Fletcher in retaliation for his complaints about Nelson's alleged reverse-race discrimination.  Accordingly, the Court will issue summary judgment to U.S. Renal Care on the retaliation claims.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 22) is **GRANTED**.

**IT IS SO ORDERED.**

DATED this 1st  day of March, 2017.

                                              BY THE COURT:

                                              s/Susan J. Dlott
                                              SUSAN J. DLOTT
                                              United States District Judge